IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANK JAROSZ, an individual      :          CIVIL ACTION
on behalf of himself and         :
others similarly situated        :
                                 :
          v.                     :
                                 :
ST. MARY MEDICAL CENTER          :          NO. 10-3330


MEMORANDUM

McLaughlin, J.                              September 22, 2014

          The plaintiff, Frank Jarosz ("Jarosz"), brings this

collective action against his former employer, St. Mary Medical

Center ("St. Mary"), pursuant to § 216(b) of the Fair Labor

Standards Act ("FLSA"), 29 U.S.C. §§ 201, et seq., for unpaid

overtime compensation for work performed during meal breaks.

Jarosz also brings state law claims as a class action under the

Pennsylvania Minimum Wage Act ("PMWA"), 43 Pa. C.S.A. §§

333.101-333.115, the Pennsylvania Wage Payment and Collection

Law ("WPCL"), 43 Pa. C.S.A. §§ 260.1, et seq., and common law

unjust enrichment.

          The plaintiff filed a motion for class certification,

pursuant to Fed. R. Civ. P. 23, and the defendant filed a motion

to decertify the conditionally certified collective action and

deny certification of the putative class action.  The Court

denies the plaintiff's motion and grants the defendant's motion.

I.    <u>Procedural History</u>

        Jarosz filed his collective and class complaint against St. Mary on July 7, 2010.[1]  Jarosz alleged that St. Mary failed to pay appropriate overtime wages under the FLSA, 29 U.S.C. § 207.  In his Complaint, Jarosz defined the FLSA Collective Class as "[a]ll persons employed within the three years preceding the filing of this action by Defendant (as hereinafter defined), whose pay was subject to an automatic 30 minute meal period deduction even when they performed compensable work during the unpaid 'meal break.'"  Complaint, ¶¶ 1, 69-75.

        The parties agreed to conditionally certify the FLSA collective action for judicial expediency and to facilitate prompt dissemination of notice to potential collective action members.  The parties stipulated, solely for purposes of conditional certification, that the FLSA collective class would consist of:

>        All employees involved in direct patient
>        care who held the positions listed in
>        Exhibit B to this Order employed between
>        April 12, 2008 and May 2, 2011, on a non-
>        exempt, hourly basis who were subject to an
>        automatic thirty minute meal break deduction

---

[1] Jarosz also named Catholic Health East as a defendant in his complaint.  Jarosz subsequently agreed to dismiss Catholic Health East as a defendant, by stipulation filed with the Court on March 31, 2011.

> during this timeframe and who have or may
> have worked through or during meal breaks
> without compensation.

Stipulation and Order to Conditionally Certify Collective Action
Class and Disseminate Notice.

The parties agreed that 2,211 employees were included
in this class.  Of those, sixty-four employees returned consent
forms to opt-in to this suit.  Thirty-four of those opt-in
plaintiffs were later dismissed by the Court.  This leaves
thirty-one opt-in plaintiffs, including Jarosz.[2]

Jarosz has also alleged claims under various state
laws.  He claims that St. Mary violated the PMWA by denying
Jarosz and the class members overtime wages earned by working
through unpaid meal breaks, and violated the WPCL by denying the
class members compensation earned under their employment
contracts.  In the alternative to his WPCL claim, Jarosz claims
that St. Mary has been unjustly enriched by retaining the
benefits of the class members' labor without providing
compensation.  Complaint ¶¶ 76-94.

---

[2] In their briefs, the parties state that there are thirty-four
opt-in plaintiffs, plus Jarosz.  Specifically, St. Mary states
that Gary Buffardi, Angela Burrows, Mary Goldman, Shirley Smith,
and Olga Turner are all opt-in plaintiffs.  The Court dismissed
these opt-in plaintiffs for failure to appear at their noticed
depositions in its Order of June 24, 2013.

In his motion, Jarosz describes the proposed Rule 23 class as:

> All persons employed by Defendant in a
> "direct patient care" capacity within its
> Commonwealth of Pennsylvania facility during
> the period July 2007 through October 2011
> whose pay was subject to an automatic
> thirty-minute meal period deduction even
> when they performed compensable work during
> the unpaid "meal break."

Pl.'s Mot. for Class Certification of the Pa. State Class Pursuant to Fed. R. Civ. P. 23 at 1.

St. Mary's Vice President of Human Resources estimated that about half of St. Mary's 3,000 employees are employed in a "direct patient care" capacity.  "Direct patient care" employees worked in at least 146 different positions across 92 different departments.  Sweeney Dep. 176:16-25, August 2, 2013; Diaz Decl. ¶ 4, Sept. 27, 2013.

II.  <u>Class Certification Record</u>

St. Mary is a comprehensive medical center in Langhorne, Pennsylvania, that provides a wide range of medical services.  It has a staff of approximately 700 physicians, 3,000 employees (referred to by St. Mary as "colleagues"), and 1,100 volunteers.  Sweeney Decl. ¶¶ 3-4, Sept. 27, 2013.

St. Mary provides a variety of medical services, including trauma care, pediatric emergency care, diagnostic imaging, obstetrics, joint replacement, and cancer treatment. Sweeney Decl. ¶ 3.

There are 175 separate departments within St. Mary. Almost all departments involved in patient care have a manager, director, or coordinator.  Managers, directors, and coordinators supervise the clinical and administrative staff on a daily basis.  Sweeney Decl. ¶¶ 4-5.

The hours of operation for individual departments varied.  Some departments operated twenty-four hours a day, seven days a week.  Others were open during regular hours Monday through Friday.  Some departments operated Monday through Friday with extended hours on the weekends.  Krol Decl. ¶ 4, Sept. 26, 2013; Gray Decl. ¶ 3, Sept. 26, 2013; Demko Decl. ¶ 5, Sept. 27, 2013; Crocker Decl. ¶ 5, Sept. 27, 2013; Rehfuss Decl. ¶ 3, Sept. 27, 2013; McHale Decl. ¶ 3, Sept. 24, 2013; Brennan Decl. ¶ 3-4, Sept. 25, 2013; Konschak Decl. ¶¶ 5, 11, Sept. 26, 2013; Boekel Decl. ¶¶ 5-6, Sept. 26, 2013; Powell Decl. ¶¶ 7-8, Sept. 30, 2013; Sweeney Dep. 101:19-102:2.

St. Mary uses the Kronos Time and Attendance System (the "Kronos system") to keep track of hours worked by employees for payroll purposes.  Starting in 2007 or earlier, the Kronos

system automatically deducted a thirty-minute meal break for non-exempt employees who worked at least five and one half consecutive hours in a day.  If an employee worked through their meal break, the automatic deduction could be cancelled and the employee paid for the thirty minutes.  This automatic deduction was turned off for certain shifts or units within St. Mary.  On December 15, 2011, the Kronos system was upgraded and the automatic deductions came to an end.  Instead, the Kronos system asked employees at the end of their shifts whether they had taken a meal break.  Sweeney Dep. 66:18-69:10; Sweeney Decl. ¶¶ 15-17.

St. Mary had several system-wide policies relevant to Jarosz's claims.  St. Mary's Meal and Break Periods policy from February 2006 through January 2011 stated, in relevant part:

    A.   Scheduling

        1.   The Medical Center will make every
             effort to schedule meal periods
             and breaks for colleagues in
             conjunction with the needs of the
             department.

        2.   Individual colleague meal periods
             and breaks will be scheduled by
             the immediate supervisor.
             Scheduling will be arranged so
             that the department can maintain
             uninterrupted service.  Colleagues
             must notify his/her supervisor
             prior to leaving the department
             for break and meal periods. . . .

B.   Meal Periods

   1.   Colleagues who work at least five
        and one-half (5-1/2) consecutive
        hours in a day are entitled to a
        thirty (30) minute unpaid meal
        period.  This meal break will be
        deducted from time worked unless
        previous arrangements have been
        made to allow the colleague to
        work through the meal period.

   2.   Meal periods are unpaid time and
        are not considered work time.

   3.   Colleagues cannot arbitrarily work
        through the meal break in order to
        leave early or arrive late.  In
        the event that a colleague works
        through the meal period, the time
        should be recorded and paid as
        time worked.  Working through the
        meal period must be approved in
        advance.

Sweeney Decl. Ex. B.  The Meal and Break Periods policy that

took effect in January 2011 was substantially similar, except

that it added the following: "Colleagues who arbitrarily works

[sic] through their meal break without permission are subject to

disciplinary action."  Sweeney Decl. Ex. C.

   St. Mary's Overtime policy stated, in relevant part:

B.   Time Worked

   1.   Hours worked will be considered as
        time worked for the purpose of
        computing overtime.  Hours
        considered for overtime
        calculation include all time
        worked, including paid break time
        and meeting or in-service time

required by the Medical Center. .
. .

C.   Authorization to Work Overtime

1.   Colleagues must receive
authorization from their
supervisor prior to working
overtime except in the event of an
emergency.

2.   In the event of an emergency, the
overtime worked must subsequently
be reviewed by the colleague's
supervisor.

3.   Colleagues who work overtime
without authorization must be paid
in accordance with this policy,
and the FLSA, for the hours
worked.  However, repeated
incidents of working overtime
without authorization may result
in disciplinary action.

Sweeney Decl. Ex. E.

St. Mary's Automated Time & Labor System policy in
effect from September 2005 through December 2009 stated, in
relevant part:

1.   All non-exempt (hourly) colleagues must
swipe in and out each day worked at the
appropriate terminal.  Colleagues must
also swipe in/out any time they leave
the Medical Center/worksite grounds.
If a colleague is re-assigned
departments or job codes at any time
during a shift (or start of a shift),
they are also required to make
appropriate transactions at the
terminals. . . .

5.   Any non-exempt (hourly) colleague
required to work through their

scheduled lunch break will be
compensated accordingly.  When a
colleague works through his/her lunch
break, the manager must add a comment
into the colleague's timecard and
follow the appropriate written
procedure to pay them for the time.  If
a colleague leaves his/her working area
for doctor's appointments, leaves the
Medical Center grounds for lunch, etc,
he/she is required to swipe in and out.

Sweeney Decl. Ex. H.  A new Automated Time & Labor System policy

took effect in December 2009, but the portions relevant to this

case were not altered.  Sweeney Decl. Ex. G.

The Automated Time & Labor System policy was modified

again in July 2011.  The new policy stated, in relevant part:

1.   All non-exempt (hourly) colleagues must
swipe in and out each day worked at the
appropriate terminal.  Colleagues must
also swipe in/out any time they leave
the Medical Center/worksite grounds.
If a colleague is re-assigned
departments or job codes at any time
during a shift (or start of a shift),
they are also required to make
appropriate transactions at the
terminals. . . .

5.   Any non-exempt (hourly) colleagues
required to work through their
scheduled meal break will be
compensated accordingly.  If a
colleague works through their scheduled
meal break, whether approved or
unapproved, they must submit a *Timecard
Change Form* to their manager.  The
manager must add a comment into the
colleague's timecard and follow the
appropriate written procedure to pay

them for the time.  The manager will
retain the *Timecard Change Form* for a
minimum of 3 years from the adjustment
date.  If a colleague leaves his/her
working area for doctor's appointments,
leaves the Medical Center grounds for
lunch, etc, he/she is required to swipe
in and out.

6.     The Payroll Department may approve the
use of a "log" to record the
adjustments made in Kronos such as
missed punches and working through
scheduled lunch breaks.  The use of a
"log" may be necessary for large
departments with significant activity
and multiple shifts.  At a minimum, the
log must contain the employee name,
date, reason for adjustment, employee
signature, and lead/manager signature.
The manager will retain the log for a
minimum of 3 years from the adjustment
date.

Sweeney Decl. Ex. F.

     These policies were communicated to individual

employees in several different ways.  Each department had a

hardcopy policy and procedure manual which employees could

access.  Important updates to policies would be sent to

employees via either mail or email.  New or modified policies

were also communicated to departmental leaders at monthly

leadership meetings.  Department leaders then informed employees

of the new or modified policies at monthly departmental staff

meetings.  Sweeney Dep. 27:11-28:21, 140:23-142:18.

Although St. Mary's official policy was to compensate employees required to work through their scheduled meal periods, there was no system-wide mechanism for scheduling meal breaks or cancelling the automatic meal deductions.  Instead, St. Mary delegated these responsibilities to the various department managers within the hospital.  St. Mary did not provide instructions to individual departments regarding how to implement the meal break procedures.  Sweeney Decl. ¶¶ 10, 17, Ex. D, Ex. G, and Ex. I at 22; Sweeney Dep. 66:18-69:10, 106:10-107:8, 134:15-135:6.

Individual departments had differing policies for the scheduling of meal breaks.  Some scheduled meal breaks during a specified time of the day with scheduled replacements for coverage.  Others let individual employees schedule their own meal breaks and arrange for coverage.  Some departments had differing meal scheduling policies for smaller units within the department.  Brennan Decl. ¶ 4; Gray Decl. ¶ 5; Konschak Decl. ¶ 12; Boekel Decl. ¶ 8.

Although each department within the hospital had its own system of cancelling the automatic deductions, most required the individual employee to give some form of notice to his or her supervisor that he or she worked through lunch.  Some departments required employees to fill out a "Kronos Timecard

Change Form" to cancel an automatic meal deduction after a
missed lunch.  Other departments provided department-specific
forms for employees to use in claiming a missed lunch.  Larger
departments used a logbook with a separate page for each
employee.  Smaller departments employed an informal system, in
which employees could inform their manager that they worked
through lunch orally or via cell phone text message.  Sweeney
Dep. 124:15-23; Demko Decl. ¶ 8; Baines Dep. 24:3-25:23, April
18, 2013; Rehfuss Decl. ¶ 5; Brennan Decl. ¶ 5; Konschak Decl. ¶
18.

        Department meal break procedures were communicated to
employees in a variety of ways, including at department
orientation, at staff meetings, or through memos.  Konschak
Decl. ¶¶ 14, 19-20; Krol Decl. ¶ 12; Gray Decl. ¶ 8; Demko Decl.
¶ 11; Rehfuss Decl. ¶ 7; McHale Decl. ¶ 8; Boekel Decl. ¶ 12.

        Individual departments also had the responsibility to
enter meal deduction cancellations into the payroll system after
employees claimed a missed lunch.  Within some departments, more
than one manager, supervisor, or coordinator had the power and
responsibility to enter the cancellations into the system.
Brennan Decl. ¶ 5; Konschak Decl. ¶¶ 14, 16; Gray Decl. ¶ 7;
Demko ¶¶ 7-8; Crocker Decl. ¶¶ 6, 8; Rehfuss Decl. ¶ 6; Snyder
Decl. ¶ 12, Sept. 25, 2013; Boekel Decl. ¶ 11.

The reasons employees were forced to miss meal breaks differed from department to department and employee to employee. Some employees had to respond to patient emergencies, or "codes," during lunch.  Others missed their lunch break because patient appointments would run late or patients would arrive early for their appointments.  Still others missed their lunch break to perform administrative tasks they did not have time to perform otherwise.  Jarosz Dep. 42:24-43:21, July 26, 2013; Maisano Dep. 24:6-16, July 31, 2013; Despo Dep. 21:16-22:13, Aug. 5, 2013; Lawrence Dep. 21:11-22:10, June 20, 2013.

The frequency with which employees worked through meal breaks also differed from employee to employee.  Some were able to take full, thirty minute meal breaks sporadically.  Others rarely, if ever, took a full meal break.  In some departments, missed meal breaks were rare.  M. Martin Dep. 38:5-39:4, June 22, 2013; Jeanty Dep. 30:3-19, April 18, 2013; H. Martin Dep. 70:14-24, June 22, 2013.

From July 7, 2007, to December 15, 2011, a total of 1,098,576 shifts were worked which were subject to the automatic meal deduction.  The meal break deductions were cancelled for 66,411 shifts in this time frame.  Deale Decl. ¶ 4, Sept. 27, 2013.

A majority of the thirty-one opt-in plaintiffs are
nurses.  Other positions held by the opt-in plaintiffs include
Respiratory Therapist, CAT Scan Technologist, and Cardiology
Technologist.  The opt-in plaintiffs worked in eighteen
different departments with at least twenty-one different
supervisors.  Diaz Decl. ¶ 5 and Ex. A.

Of the thirty-one opt-in plaintiffs, eleven were
deposed.  The eleven deposed opt-in plaintiffs worked a variety
of shifts at St. Mary, including:  eight hours per day, two days
per week; eight hours per day, five days per week; twelve hours
per day, three times per week; and sixteen hours on Saturday,
eight hours on Sunday, with sporadic hours during the week.
Baines Dep. 16:1-15; Despo Dep. 16:22-17:8; Jarosz Dep. 15:6-24;
M. Martin Dep. 21:7-20.

Six opt-in plaintiffs testified that they knew their
department's procedures for cancelling an automatic meal
deduction.  Three opt-in plaintiffs testified that they did not.
Compare Baines Dep. 25:20-23; Despo Dep. 38:11-39:22, 46:4-16;
Maisano Dep., 86:12-25, 87:22-88:3; Marchion Dep. 22:20-23:14,
April 17, 2013; H. Martin Dep. 35:6-23; and M. Martin Dep.
57:12-19 with Jeanty Dep. 32:7-10; Jarosz Dep. 44:24-45:5,
74:16-22; and Weber Dep. 52:16-53:10, April 16, 2013.

A slight majority of the deposed opt-in plaintiffs testified that they were never discouraged from requesting payment for missed meals.  The other opt-in plaintiffs testified that there was at least one instance in which they were directed not to request compensation for working through a meal break. Compare Baines Dep. 29:1-9, 53:6-10; Daily Dep. 71:4-8, April 20, 2013; Jeanty Dep. 34:4-12; H. Martin Dep. 47:14-48:8; M. Martin Dep. 33:1-34:21; Weber Dep. 14:18-15:3, 48:12-19 with Marchion Dep. 24:21-25:17, 37:10-21; Jarosz Dep. 14:2-14; Lawrence Dep. 32:3-24; Maisano Dep. 99:22-100:12.


III. Analysis

The conditional FLSA collective class will be decertified because Jarosz has not shown by a preponderance of the evidence that the opt-in plaintiffs are similarly situated as required by 29 U.S.C. § 216.  Similarly, class certification for the state law claims will be denied because the commonality and predominance requirements of Rule 23 have not been satisfied.

A.    <u>Certification of the FLSA Collective Action</u>

1.    <u>Legal Standard</u>

Jarosz brings his FLSA collective action under 29 U.S.C. §§ 207 and 216.  Section 207 of Title 29 of the United States Code prohibits employers from denying employees overtime wages at a rate "not less than one and one-half times the regular rate" for any hours worked over forty in one work week, and 29 U.S.C. § 216(b) creates a civil cause of action against employers who violate § 207.  This cause of action may be brought by "one or more employees for and in behalf of himself or themselves and other employees similarly situated."  <u>Id.</u>  Employees must give their consent in order to be a plaintiff in a collective action under this section; in other words, they must "opt-in."  <u>Id.</u>

The Third Circuit has embraced a two-step approach to certification of an FLSA collective action.  <u>Zavala v. Wal Mart Stores Inc.</u>, 691 F.3d 527, 536 (3d Cir. 2012).  In the first step, the district court is to apply a fairly lenient standard for conditional certification that requires only substantial allegations that the members of the collective action were victims of a single decision, policy, or plan.  <u>Id.</u> at 535.[3]

---

[3] Because the parties stipulated to conditional certification, the Court did not undertake this analysis at the conditional certification stage of the litigation.

A stricter standard applies on final certification. To certify an FLSA collective action for trial, a district court must make a finding of fact that the members of the collective action are similarly situated. Id. at 534. A plaintiff bears the burden of proving the opt-in plaintiffs are similarly situated by a preponderance of the evidence. Id. The present motion to decertify calls for analysis under this stricter standard.[4]

To determine whether the members of the collective action are similarly situated, the court should consider all of the relevant factors and make a factual determination on a case-by-case basis. Id. at 536. Relevant factors include:

> whether the plaintiffs are employed in the
> same corporate department, division, and
> location; whether they advance similar
> claims; whether they seek substantially the
> same form of relief; and whether they have
> similar salaries and circumstances of

---

[4] In its reply brief, St. Mary raised for the first time an argument that Jarosz waived final certification for the FLSA collective action because he did not move for final certification by the deadline set by the Court. However, St. Mary did not cite any case law supporting the position that a plaintiff must move for final FLSA certification or risk waiver. In Zavala, the plaintiff did not move for final FLSA certification; the defendant moved to decertify the provisionally-certified collective action. 691 F.3d at 533. Although the waiver issue was apparently not raised, the Court notes that the Zavala court reached the merits of the FLSA final certification question despite the fact that the plaintiff did not move for final certification. Id. at 534-38. The Court will address the FLSA final certification question on the merits.

> employment.  Plaintiffs may also be found
> dissimilar based on the existence of
> individualized defenses.

Id. at 536-37.  This list of factors is not exclusive.  Id. at

537.  Additionally, the collective action members should have

been impacted by a common employer practice that, if proved,

would help demonstrate a violation of the FLSA.  Id. at 538.


### 2.  Application of the Standard

The opt-in plaintiffs did not have similar

circumstances of employment.  They held a variety of different

positions in many different departments, and worked under

numerous supervisors.  These varied employment circumstances are

important due to the decentralized implementation of the meal

break policy.

Each department created its own procedures for

scheduling meal breaks and cancelling automatic deductions when

employees worked through their meal breaks.  The reasons for and

frequency with which employees missed meal breaks changed

depending on the opt-in plaintiffs' department and occupation.

The opt-in plaintiffs also worked a variety of shifts, many of

which would fall below the forty-hour overtime threshold even if

the meal breaks were compensable work time.

The frequency with which the opt-in plaintiffs worked through meals, the procedures for cancelling meal break deductions, whether they utilized those procedures, and the amount of hours worked in a given work week are all relevant to the inquiry of whether the opt-in plaintiffs worked in excess of forty hours per work week and were not paid overtime wages.  The fact that there are significant differences in these factors weighs heavily against a finding that the opt-in plaintiffs are similarly situated.

A number of other district courts have arrived at the same conclusion on similar facts.  See Creely v. HCR ManorCare, Inc., 920 F. Supp. 2d 846, 852-54 (N.D. Ohio 2013); Camilotes v. Resurrection Health Care Corp., 286 F.R.D. 339, 346-52 (N.D. Ill. 2012); Kuznyetsov v. West Penn Allegheny Health Sys., Inc., 2011 WL 6372852, at *8 (W.D. Pa. Dec. 20, 2011); Camesi v. University of Pittsburgh Med. Ctr., 2011 WL 6372873 (W.D. Pa. Dec. 20, 2011); Frye v. Baptist Mem'l Hosp., Inc., 2010 WL 3862591 (W.D. Tenn. Sept. 27, 2010), aff'd 495 Fed.App'x 669 (6th Cir. 2012) (unpublished).[5]

---

[5] Jarosz relies on Burger v. Cleveland Clinic Foundation, 2007 WL 2902907 (N.D. Ohio Sept. 29, 2007), in support of his contention that the opt-in plaintiffs are similarly situated.  There are several key factors that distinguish this case from Burger.  In Burger, all of the opt-in plaintiffs were either respiratory technicians or respiratory therapists working within the same department in the hospital.  Id. at *3.  All of the opt-in

Jarosz argues that the fact that the opt-in plaintiffs were all subject to St. Mary's automatic deduction policy is enough on its own to show that the opt-in plaintiffs are similarly situated.  As explained above, however, this common employer practice on its own is not enough to help demonstrate a violation of the FLSA.  <u>Zavala</u>, 691 F.3d at 538.  The frequency with which the opt-in plaintiffs worked through lunch and whether they cancelled the automatic deductions for those missed lunches will be determinative factors in showing that they worked over forty hours a week and did not receive overtime compensation.  These factors differed among departments and individual employees.  Therefore, the automatic meal deductions policy, on its own, is not enough to render the opt-in plaintiffs as similarly situated.  <u>See, e.g.</u>, <u>Camilotes</u>, 286 F.R.D. at 349.

Jarosz also argues that the decentralized implementation of the meal break policies is enough on its own to show that the opt-in plaintiffs are similarly situated.  For example, Jarosz argues that the reliance on individual

---

plaintiffs were subject to the same procedure for cancelling automatic meal break deductions.  <u>Id.</u>  In this case, however the opt-in plaintiffs held a variety of different positions in many different departments.  They were subject to differing policies regarding how to cancel automatic meal break deductions.  These distinctions are highly relevant to the opt-in plaintiffs' FLSA claims.

departments to train employees on when and how to cancel automatic meal deductions gave rise to issues "falling through the cracks." Pl.'s Opp. to Def.'s Mot. to Decertify at 6. In effect, Jarosz claims the opt-in plaintiffs are linked by a *lack* of a policy common to each of them.

The experiences of the deposed opt-in plaintiffs show that significant differences existed among the opt-in plaintiffs' meal cancellation experiences due to the decentralized nature of St. Mary's deduction cancellation policy. Six opt-in plaintiffs testified that they knew how to cancel automatic meal break deductions; three testified that they did not. Additionally, six opt-in plaintiffs testified that they had never been discouraged from cancelling meal break deductions; four had been discouraged at least once by another employee.

These differences show that the opt-in plaintiffs were not uniformly affected by St. Mary's department-by-department approach to meal deduction cancellations. Therefore, the lack of a uniform policy does not establish a link common to the opt-in plaintiffs.

The disparate employment settings of the opt-in plaintiffs, combined with the decentralized implementation of the meal deduction policy, preclude finding that the opt-in

plaintiffs are similarly situated.  Individual issues would
overwhelm common ones, making a collective action inappropriate.
St. Mary's motion to decertify the conditionally certified
collective action is granted.


      B.   <u>Rule 23 Class Certification</u>

      Jarosz has moved to certify the proposed state law
class under Fed. R. Civ. P. 23.  Rule 23 ensures that the named
plaintiffs are appropriate representatives of the class whose
claims they wish to litigate.  <u>Wal-Mart Stores, Inc. v. Dukes</u>,
131 S. Ct. 2541, 2550 (2011).  Rule 23(a) has four requirements:
numerosity, commonality, typicality, and adequate
representation.

      In addition to satisfying the requirements of Rule
23(a), a plaintiff must show that the action falls within one of
the three types of actions under Rule 23(b).  Jarosz claims that
this class should be certified under Rule 23(b)(3), which
requires that "questions of law or fact common to class members
predominate over any questions affecting only individual
members, and that a class action is superior to other available
methods for fairly and efficiently adjudicating the
controversy."

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Dukes, 131 S. Ct. at 2550 (2011) (quoting Califano v. Yamasaki, 442 U.S. 682, 700-01 (1979) (internal quotation marks omitted). The party seeking certification bears the burden of establishing each element of Rule 23 by a preponderance of the evidence. Marcus v. BMW of North America, LLC, 687 F.3d 583, 591 (3d Cir. 2012). Failure to meet any of Rule 23(a) or 23(b)'s requirements precludes certification. Danvers Motor Co., Inc. v. Ford Motor Co., 543 F.3d 141, 147 (3d Cir. 2008).

St. Mary argues that the numerosity, commonality, typicality, and predominance requirements have not been met. The Court concludes that Jarosz has not shown that the commonality and predominance requirements are satisfied, and will deny Rule 23 class certification. Because the commonality and predominance requirements have not been satisfied, the Court will not address numerosity, typicality, or adequacy of representation.

1.   Commonality

Rule 23(a)(2) requires that questions of law or fact are common to the class. Often referred to as commonality, this

requires the plaintiff to demonstrate that the class members have suffered the same injury.  <u>Dukes</u>, 131 S. Ct. at 2551.  This does not merely mean that the class members have all suffered a violation of the same provision of law; the class members' claims must "depend upon a common contention . . . [which] is capable of classwide resolution."  <u>Id.</u>  The determination of the contention's truth or falsity must resolve an issue that is central to the validity of each one of the claims in one stroke.  <u>Id.</u>  What matters in class certification is the "capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."  <u>Id.</u> (emphasis in original) (quoting Richard A. Nagareda, <u>Class Certification in the Age of Aggregate Proof</u>, 84 N.Y.U. L. REV. 97, 132 (2009)).

Although the system-wide policy of automatically deducting thirty-minute meal breaks from employees' hours worked was common to the potential class members, this link is not enough to establish commonality.  The automatic deduction policy, on its own, is not enough to "generate common answers apt to drive resolution of the litigation."  <u>Id.</u>  To recover under their state law claims, the potential class members would still need to show that they actually worked through meal breaks and that they were not compensated for that work.

The differing experiences of the potential class members with regards to working through meal breaks and

cancelling meal break deductions suggest that these issues would require individualized inquiries, rather than common ones. Employees worked through meal breaks for a variety of reasons, ranging from responding to patient emergencies to performing administrative tasks.  Employees also worked through meal breaks with varying frequency.  In some departments, employees rarely worked through meal breaks.  In others, working through a meal break was an almost daily occurrence.  These facts indicate that the determination of whether class members worked through meal breaks would require individualized inquiries.

Similarly, the varying departmental procedures for cancelling automatic meal deductions create the need for individualized inquiries.  The degree of formality and convenience to employees of these procedures affected whether and how often employees claimed missed meal breaks. Additionally, not all potential class members knew how to cancel deductions due to differences in departmental training on meal cancellation procedures.  These factors are relevant to the inquiry of whether potential class members made claims for missed meal breaks and were thus compensated.  The determination of whether potential class members were ultimately compensated for working through meal breaks would therefore require individualized inquiries.

The individualized inquiries required to show that potential class members worked through meal breaks and were not paid for their work preclude a finding of commonality.  See also Hernandez v. Ashley Furniture Industries, Inc., 2013 WL 2245894, at *7-10 (E.D. Pa. May 22, 2013); Camilotes, 286 F.R.D. at 354-55.[6]

Jarosz's argument that St. Mary's decentralized implementation of the meal policy binds the class members together is also not persuasive.  In an employment discrimination case, the Supreme Court stated that a policy of allowing discretion by local supervisors is "just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy against having uniform employment practices."  Id. at 2554 (emphasis in original).

Although the Supreme Court was dealing with a different cause of action in Dukes, its reasoning is equally

---

[6] Jarosz relies on Colozzi v. St. Joseph's Hosp. Health Center, 275 F.R.D. 75, 84-86 (N.D.N.Y. 2011) and Hamelin v. Faxton-St.Luke's Healthcare, 274 F.R.D. 385, 394-96 (N.D.N.Y. 2011), two factually similar cases in which the court found the commonality requirement satisfied, to support his contention that there is commonality in this case.  The Court does not find the reasoning in those cases persuasive.  For example, in Colozzi, the court stated that the proposed class members' differing employment circumstances were "irrelevant."  275 F.R.D. at 85-86.  In this case, the differences among the potential class members present numerous individualized inquiries that go to liability.  They are highly relevant and prevent a finding of commonality.

applicable in this context.  The experiences of the potential
class members illustrate that the decentralized implementation
of St. Mary's meal policy created differing, rather than uniform
results.  This weighs against a finding of commonality, rather
than for it, as Jarosz claims.


      2.   <u>Predominance</u>

      Rule 23(b)(3) requires that "questions of law or fact
common to class members predominate over any questions affecting
only individual members, and that a class action is superior to
other available methods for fairly and efficiently adjudicating
the controversy."  The predominance inquiry "tests whether
proposed classes are sufficiently cohesive to warrant
adjudication by representation."  <u>Amchem Products, Inc. v.
Windsor</u>, 521 U.S. 591, 623 (1997).  It requires more than just a
common claim among the putative class members.  <u>In re Hydrogen
Peroxide Antitrust Litigation</u>, 552 F.3d 305, 311 (3d Cir. 2008).
If "proof of the essential elements of the cause of action
require individual treatment, then there cannot be a
predominance of 'questions of law and fact common to the members
of the class.'"  <u>In re Linerboard Antitrust Litigation</u>, 305 F.3d
145, 156 (3d Cir. 2002).  The Court has a duty to take a close
look at whether common questions predominate over individual
ones.  <u>Comcast Corp. v. Behrend</u>, 133 S. Ct. 1426, 1432 (2013).

The differences among the potential class members preclude a finding that common questions predominate over individual ones.  The crux of the various state law claims is that the class members performed compensable work without being paid.  Although the automatic deduction policy is common to all class members, it is not central to the validity of the state law claims.  Instead, the central questions will be whether the class members worked through meal breaks and whether they were ultimately paid for the meal breaks they worked through.

There are significant differences as to whether, why, and how often individual class members worked through meal breaks.  Some potential class members rarely worked through meal breaks; others almost always did so.  Some worked through meal breaks to respond to patient emergencies; others performed administrative tasks during meal breaks.  These differences illustrate that whether and how often potential class members worked through meal breaks would be an individualized inquiry, rather than a common one.

Similarly, differences among departmental meal deduction cancellation procedures bear directly on whether potential class members were ultimately compensated for any meal breaks they worked through.  Each department had its own procedure for cancelling the meal deductions.  Some departments had formal procedures, which required employees to fill out

forms or log books in order to claim a missed lunch.  Others were more informal; employees could inform their manager orally or via cell phone text message that they worked through lunch.

These differences impact the inquiry of whether potential class members were ultimately compensated because they affected whether and how often potential class members attempted to cancel meal deductions.  For example, one potential class member testified that she did not always claim missed lunches because of her department's cancellation procedures.  Baines Dep. 18:20-22:20.  Additionally, differences in departmental training procedures caused some potential class members to know about their department's cancellation procedures and some not to know.  Thus, the determination of whether potential class members were ultimately compensated for working through meal breaks would require individualized inquiries.

The differences among the potential class members show that "proof of the essential elements of the cause of action require individual treatment," and therefore that issues common to the putative class do not predominate over individual issues. In re Linerboard Antitrust Litigation, 305 F.3d at 156; see also Hernandez, 2013 WL 2245894 at *7-10; Camilotes, 286 F.R.D. at 354-55; Burkhart-Deal, 2010 WL 457122 at *3-6.[7]

---

[7] Jarosz relies on Colozzi, 275 F.R.D. at 87-89 and Hamelin, 274 F.R.D. at 397-99, two factually similar cases in which the court

Jarosz argues that many of these individual issues go to damages, and that they should not prevent certification of the class.  As detailed above, individual inquiries will be required to establish liability.  Even if the individual inquiries went solely to damages, however, Jarosz's argument would still fail.  The Supreme Court has held that overwhelming questions of individual damage calculations can preclude a finding that common issues predominate over individual ones. Comcast Corp., 133 S. Ct. at 1432-33.  Even if Jarosz is correct that the many differences among the potential class members go solely to damages and not liability, they would still present individualized inquiries that would prevent a finding that common issues predominate.

An appropriate order shall issue.

---

certified a class action under Rule 23(b)(3), to support his contention common issues predominate over individual ones.  The Court does not find the reasoning of those cases persuasive. For example, the court in Colozzi recognized the fact that the "defendants have no uniform policy for cancelling the automatic deduction may present plaintiffs with evidentiary challenges down the road," but stated that these differences should not bar the plaintiffs from certifying the class without explaining why. 275 F.R.D. at 88.  In this case the differences among potential class members create numerous individualized issues that go to liability.